**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No. 1:05-CR-443** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANKLIN ROBINSON, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

In a superseding indictment filed December 8, 2005, Defendants in the above-captioned case were charged with various crimes involving the interstate transportation of adults and minors for prostitution and with money laundering. After consolidation of Defendants' pre-trial schedules, and following several continuances, the Court has scheduled jury selection and trial to begin on October 1, 2007.

Now pending before the Court are motions filed by Defendants Franklin Robinson and Derick Price to suppress evidence obtained from wiretaps on cellular telephones used by Defendants Robinson and Derek Maes that had been authorized by Judge Vanaskie, who was at that time the Chief Judge of the Middle District of Pennsylvania.[1] (Doc. Nos. 432, 454.) Robinson and Price have advanced an assortment of arguments in support of their motions,

---

[1] Subsequent to filing his motion to suppress, on March 16, 2007, pursuant to a plea agreement with the United States, Robinson pleaded guilty to counts 1 and 16 of the superseding indictment, charging him with, respectively, violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 2422 (coercion and enticement of individuals to travel in interstate commerce to engage in prostitution). Additionally, on May 15, 2007, also pursuant to a plea agreement, Derick Price entered a plea of guilty to counts 1 and 3 of the superseding indictment charging him with, respectively, violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 2423(a) (transportation of minors). Notwithstanding the fact that Robinson and Price have entered guilty pleas, the Court will adjudicate the motions because Defendants Britton, Maxwell, and Hayes have joined in the requested relief. Defendants Maes and Simpson also previously moved to join the motion, but they have since pleaded guilty pursuant to agreements with the United States.

including the following: (1) that the affidavits offered in support of the applications for the wiretaps and extensions thereof failed to satisfy the statutory requirement of "necessity" set forth in 18 U.S.C. § 2518(3)(c); (2) that the Government failed to minimize the intercepted calls as required by 18 U.S.C. § 2518(5); (3) that the results of the wiretaps were not sealed immediately upon expiration of the extension orders authorizing the wiretaps as required by 18 U.S.C. § 2518(8)(a); (4) that the Government deliberately and advertently failed to comply with the notice and inventory provisions of 18 U.S.C. § 2518(8)(d); and (5) that Agent Stossel's affidavits failed to provide probable cause to believe that particular communications regarding the alleged offenses would be obtained through electronic interception as required by 18 U.S.C. § 2518(3)(b).

Related to their motions to suppress, Robinson and Price have requested that the Court convene a hearing in accordance with <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) ("<u>Franks</u> hearing"), to allow them to examine FBI Agent John Stossel regarding his alleged intentional or reckless omission of certain facts from his supporting affidavits. Defendants maintain that had these omissions been included in the original applications, the authorizing judge would have concluded that the wiretaps were not necessary either because the Government had sufficient evidence to obviate the need for electronic surveillance, or the Government had not yet pursued traditional investigatory techniques that might have yielded evidence without the need for a wiretap. In support of their requests that the Court convene a <u>Franks</u> hearing, Robinson and Price have submitted information they argue was omitted from the affidavits, and they contend that the inclusion of this allegedly material information would have vitiated Judge Vanaskie's finding of necessity. (Doc. Nos. 617, 618.)

I.      BACKGROUND

On April 7, 2005, the Government filed an application for authorization pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III"), to intercept wire communications of Derek Maes, Franklin Robinson, and approximately 17 other individuals over a cellular telephone used by Maes (this wiretap shall hereafter be referred to as "Maes-I").[2]  On that same date, Judge Vanaskie of this Court entered an order authorizing the interception of calls to and from the identified telephone.  On April 25, 2005, the United States sought and obtained an order from Judge Vanaskie modifying the original April 7 order. The United States filed 10-day reports with the Court on April 25, 2005 (covering the period from April 12 through April 21, 2005), May 5, 2005 (covering April 22 through May 1, 2005), and May 13, 2005 (covering May 2 through May 11, 2005).

On May 16, 2005, the Government filed an application for extension of the authorization to continue interception over the same cellular phone and named additional persons whose calls were expected to be intercepted in addition to those named in the original application (hereafter "Maes-II").  The United States filed reports with the Court summarizing the results of the investigation on June 7, 2005 (covering May 16 through May 25, 2005), June 7, 2005 (covering May 26 through June 4, 2005), and on June 16, 2005 (covering June 5 through June 14, 2005). On June 14, 2005, the Title III intercept for this cellular phone was terminated.  The tapes of the recorded conversations were sealed on June 16, 2005.

On July 20, 2005, the Government filed an application for authority pursuant to Title III

_____

[2]  This cellular telephone was subscribed to and billed to a John J. Willis, 1315 Potomac Drive, Toledo, Ohio, 43607.

to intercept wire communications of Franklin Robinson, Derek Maes, and approximately 30 other individuals over a cellular phone used by Robinson, as a continuation of the Maes wiretap (hereafter "Robinson-I").[3]  Judge Vanaskie authorized the wiretap on the same date.  As with the Maes wiretap, the United States filed 10-day reports with the Court summarizing the nature of the intercepted telephone calls.  On April 1, 2005, the United States filed its first such report (covering July 21 through July 30, 2005).  The second 10-day report was filed on August 10, 2005 (covering July 31 through August 9, 2005).  On August 17, 2005, the Government filed an application for authority to continue to intercept wire communication over this cell phone.  Judge Vanaskie approved this request, authorizing the Government to continue intercepting calls to and from Robinson's cellular phone for an additional 30 days ("Robinson-II").  Following this authorization, the Government filed a third 10-day report on August 22, 2005 (covering August 10 through August 19, 2005).  On August 30, 2005, the Government filed another 10-day report (covering August 20 through August 29, 2005).  A fifth 10-day report was filed on September 7, 2005 (covering August 30 through September 7, 2005).  The Government represents that in this report, it advised the Court that no pertinent calls had been intercepted between August 22, 2005, and September 7, 2005.  On September 19, 2005, the United States filed a final report to advise that since August 22, 2005, Robinson's telephone had been shut down for non-payment of its bill.  On September 22, 2005, the Court issued an order sealing the tapes of the calls intercepted from the tap of Robinson's cell phone.

---

[3]  This cellular telephone was subscribed to and billed to a Michael Tucker, 1231 Bronson Avenue, Toledo, Ohio, 43608.

II.    **DISCUSSION**

A.    **Necessity**

Defendants' first and primary argument in support of their motions to suppress the results of the Maes and Robinson wiretaps is that the Government failed to sustain its burden of demonstrating that electronic surveillance was necessary to the investigation into the criminal and conspiratorial activity alleged in the superseding indictment.  Essentially, Robinson and Price both argue that at the time it sought the first wiretap in Maes-I, the Government had already developed substantial evidence amounting to probable cause that the Defendants had committed various crimes, and that because the Government was in possession of such evidence, there could have been no need to authorize wiretaps to develop further evidence.  Additionally, Robinson and Price contend that the United States failed to demonstrate that other less intrusive investigatory techniques would have been inadequate, and argue that such techniques could have been employed and would therefore have obviated the Government's stated need for the wiretaps in this case.  In support of their arguments regarding necessity, Robinson and Price have requested that the Court hold a <u>Franks</u> hearing so that they may question Agent Stossel regarding various alleged factual omissions from his affidavits that Robinson and Price contend would have caused a reasonable jurist to conclude that the Government could not meet its burden of demonstrating necessity.

Before issuing an order authorizing a Title III wiretap, it is required that "the judge determine[] on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous."  18 U.S.C. § 2518(3)(c).  Title III's requirement that the Government

5

demonstrate necessity is intended to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.  United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  The Third Circuit has emphasized that Title III's necessity requirement does not mandate that the Government exhaust all other investigative procedures before resorting to electronic surveillance.  United States v. Williams, 124 F.3d 411, 418 (3d Cir. 1997).  Instead, it is sufficient if there is evidence that "normal investigative techniques . . . reasonably appear to be unlikely to succeed if tried."  Id. (quoting 18 U.S.C. § 2518(3)(c)).  To make such a showing, "[t]he government need only lay a 'factual predicate' sufficient to inform the [authorizing] judge why other methods of investigation are not sufficient."  United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992) (quoting United States v. Armocida, 515 F.2d 29, 38 (3d Cir. 1975)).  In determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents."  Williams, 124 F.3d at 418 (quoting United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989).  In this regard, "[t]he government's showing is to be 'tested in a practical and commonsense fashion.'"  McGlory, 968 F.2d at 345 (quoting United States v. Vento, 533 F.2d 838, 849 (3d Cir. 1976)).

Defendants argue that at the time Agent Stossel and the Government applied for the Maes-I wiretap, the Government already had an abundance of evidence relevant to the investigation and regarding the individual subjects of the investigation.  Robinson notes that the Agent Stossel had advised the issuing judge that the investigation had been ongoing for more than one year and had allowed investigators to identify the alleged crimes and the alleged perpetrators.  Price asserts that because the "intensive investigation into the alleged prostitution-

6

related conspiracy . . . had identified virtually all of the indicted defendants[.] . . . the Government had a plethora of information already at its disposal." (Doc. No. 461, at 7.) Price additionally points to the fact that the Government had received what he describes as "abundant information" regarding nearly all aspects of the investigation using traditional investigative tools, including witness cooperation and interviews, surveillance, grand jury testimony, and pen registers. (Id.)

The Government concedes that it had undertaken a broad investigation into a multi-state conspiracy, and that its traditional investigative techniques had yielded a certain degree of information regarding the participants and their alleged criminal activity. However, although Agent Stossel acknowledged that the initial investigation had been met "with some degree of success," (Maes-I at 64), he also emphasized that the chief goal of the investigation was the identification of all pimps and their prostitutes (in particular, the chief prostitutes that assist pimps in running a prostitution enterprise) and that this goal could only be achieved through the interception of wire communications. (Id. at 64-65.) As support for this assertion, Agent Stossel provided an affidavit in which he set forth detailed information regarding the secretive nature that attends the illicit business of interstate prostitution and attested that utilizing grand juries, informants, physical surveillance, review of telephone toll records, and the use of pen registers and trap-and-trace devices had thus far proven inadequate to achieve the investigation's objective. (Id. at 65.) Agent Stossel attested that investigators working the case had considered and rejected numerous traditional investigative methods as inadequate or impractical given the circumstances, including the use of search warrants at the targets' residences, the arrest and cooperation of principal suspects, and the use of confidential informants or undercover agents. (Id.)

7

Notably, Agent Stossel also detailed in his affidavit much of the information obtained through confidential informants, including current or former prostitutes, as well as why such information was of limited use, primarily owing to the compartmentalized and hierarchical nature of the alleged conspiracy: these informants had little or no ability to penetrate the criminal conspiracies being investigated, and they had relatively limited access to the primary targets of the investigation. (Id. at 66.) Given the particular nature of the crimes being investigated, Agent Stossel also outlined special legal, safety, and ethical concerns that precluded the use of prostitutes or other undercover personnel to commit crimes in order to infiltrate the criminal networks under investigation. (Id. at 66-68.)

With respect to traditional investigatory techniques that were deemed inadequate or too dangerous, Agent Stossel provided detail regarding the limited utility of physical surveillance, particularly given considerations relevant to investigation into pimps and prostitutes. (Id. at 68-70.) Agent Stossel advised Judge Vanaskie that the use of pen registers and trap-and-trace devices would not be useful, and that search warrants would be of little assistance because of the typically mobile manner in which pimps operated. (Id. at 71-72.) In addition to providing additional information as to why using cooperating principals was unlikely to be useful, (id. at 73-74), Agent Stossel explained the particular problems presented by grand jury investigations in cases of this nature, (id. at 74-77), and the especially limited utility of traditional techniques such as garbage searches (id. at 77). Agent Stossel included similar analysis and explanation in each of his three other affidavits offered in support of Maes-II, Robinson-I, and Robinson-II.

Robinson and Price offer various replies to the Government's position. First, Robinson and Price reiterate their arguments that, in their assessment, the investigation had been so

spectacularly successful in uncovering evidence that there was simply no need for the wiretaps for which the Government applied.  Dismissive of the fact that the Government had made explicit that one of its primary objectives in seeking to utilize electronic surveillance was the discovery of evidence and information regarding the conspiracy and its scope, Robinson posits that the Government must have known the nature of the activity even by the time of its first wiretap application and that the Government must have known much more about that activity at each successive application.  Going further, Robinson brushes aside the Government's argument that it needed to know the full scope of the alleged conspiracy, reasoning that if such a justification met the necessity requirement, the rationale "would lead to continual wiretaps in almost every alleged conspiracy case."  (Doc. No. 509, at 2.)  Robinson also complains that the Government did not respond sufficiently to his contention that the Government's need for the wiretaps got weaker at each successive application, owing to the information derived from each previous wiretap.  Finally, Robinson argues, without citation to authority, that Agent Stossel's statement that a wiretap was the only technique that would assist the Government in securing "evidence necessary to prove beyond a reasonable doubt" that the suspects were engaging in the identified offenses undermines the Government's stated need, because resorting to wiretapping to ensure conviction is not what Title III contemplates given that wiretapping should be utilized sparingly.

Testing the Government's showing in a "practical and common sense fashion," Vento, 533 F.2d at 849, the Court finds that Agent Stossel and the Government adequately demonstrated their need to utilize Title III wiretaps to investigate the interstate prostitution and money-laundering conspiracy that Agent Stossel had identified and which he had been investigating.

Agent Stossel, having considerable personal experience in similar investigations in his

approximately 25 years of work with the FBI, attested with specificity and personal knowledge

that normal investigative techniques were simply inadequate to identify fully all of the pimps that

were involved in the alleged conspiracy, which allegedly spanned several states, or to accurately

identify the scope of the conspiracy.  Upon a review of each of the wiretap applications, the

Court finds that the Government presented the required factual predicate to satisfy its burden of

demonstrating the necessity of employing electronic surveillance in this case.

　　As an alternative to, or an extension of, their argument that the applications themselves

showed that the Government lacked necessity for a wiretap, Robinson and Price argue that

factual information relating to the investigation that the Government knew, but omitted from

Agent Stossel's affidavits, would have caused the issuing judge to find that the Government did

not, in fact, need the wiretaps.  Accordingly, Robinson and Price have moved the Court to

convene a Franks hearing to permit them to examine Agent Stossel about these allegedly material

omissions to determine whether they were recklessly or intentionally made.  Both Robinson and

Price argue that the inclusion of these omitted facts in Agent Stossel's affidavits would have

made clear to Judge Vanaskie that the Government did not need to utilize wiretaps as part of

their investigation into the alleged criminal activity.  The United States has filed a lengthy

rebuttal to Defendants' preliminary showing.  Upon consideration, the Court finds Defendants'

arguments unpersuasive, and their request for a Franks hearing will be denied.

　　In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court upheld the right of a

criminal defendant to challenge the validity of an affidavit made in support of a warrant.  438

U.S. at 155-56.  Franks requires that a hearing be held at a defendant's request only where he or

10

she makes a substantial preliminary showing that the affiant included in a search warrant

affidavit a false statement, knowingly or intentionally, or with reckless disregard for the truth,

and that the challenged false statements were essential to the Court's finding of probable cause.

Id.; United States v. Calisto, 838 F.2d 711, 714 (3d Cir. 1988).  Although the Court in Franks

dealt only with misstatements, the same analysis applies where an affiant is alleged to have

omitted material information from affidavits.  United States v. Frost, 999 F.2d 737, 743 n.2 (3d

Cir. 1993).  Where a defendant demonstrates that the affiant made a misrepresentation, the Court

must determine whether the misrepresentation was material, and if so, whether the affidavit

would still demonstrate probable cause – or, in this case, necessity –  if the correct information

were included.  Id. at 742-43.  Similarly, to the extent a defendant demonstrates that information

was omitted from an affidavit, the reviewing court must determine whether the omissions were

material, and if so, whether the affidavits would have demonstrated probable cause or necessity if

the omitted material had been disclosed.  Calisto, 838 F.2d at 715.  In order to succeed in a

request for a hearing, a defendant's attack must be "more than conclusory and must be supported

by more than a mere desire to cross-examine." Franks, 438 U.S. at 171.  Rather, defendant must

make "allegations of deliberate falsehood or of reckless disregard for the truth, and those

allegations must be accompanied by an offer of proof." Id.

Of particular importance to this case, the materiality component of the Franks analysis

focuses on whether the omitted information was essential to a finding of probable cause or

necessity, id. at 156, and not on what might have been relevant to these findings, let alone of

interest to the judge reviewing the warrant application.  As the late Judge Becker noted, "[a]ll

storytelling involves an element of selectivity," Wilson v. Russo, 212 F.3d 781, 787 (3d Cir.

2000), so it is therefore not surprising that many, if not all, affidavits omit information that, in

hindsight, seems significant.  As a result, although it may be easier to identify a factual omission

as opposed to an affirmative misstatement or falsehood, courts have recognized that Franks

claims based on omissions are less likely to justify suppression than claims of intentionally or

recklessly false assertions.  See, e.g., United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997)

(noting that "an allegation of omission potentially opens officers to endless conjecture about

investigative leads, fragments of information, or other matters that might, if included, have

redounded to defendant's benefit." (internal quotations omitted)); United States v. Martin, 615

F.2d 318, 329 (5th Cir. 1980) (noting that "it will often be difficult for an accused to prove that

an omission was made intentionally or with reckless disregard rather than negligently unless he

has somehow gained independent evidence that the affiant had acted from bad motive or

recklessly in conducting his investigation and making the affidavit").  This does not mean that

omissions are immune from Franks scrutiny, only that an affiant is not required to share all that

he or she knows about the investigation in an affidavit in support of a search warrant.  See United

States v. Burnes, 816 F.2d 1354, 1358 (9th Cir. 1987) ("The mere fact that the affiant did not list

every conceivable conclusion does not taint the validity of the affidavit.").  The affiant, however,

cannot intentionally or recklessly hide from the issuing judge that which would be critical to the

judge's determination regarding probable cause or, in this case, necessity for purposes of Title III.

Thus, the Third Circuit has held that an omission will be deemed reckless "if an officer withholds

a fact in his ken that 'any reasonable person would have known that this was the kind of thing the

judge would wish to know.'"  Wilson, 212 F.3d at 788 (quoting United States v. Jacobs, 986 F.2d

1231, 1235 (8th Cir. 1993)).  However, it should be emphasized that even if warrant affidavit

may have contained misstatements or omitted certain information, a warrant based on such an affidavit survives if the affidavit still establishes probable cause or necessity if the misstatements had been removed from, or the omissions had been included in, the affidavit. See Franks, 438 U.S. at 170-72.

For purposes of this opinion, the Court finds that Agent Stossel was likely cognizant of many if not all of the factual omissions that Robinson and Price have identified as having been omitted from the search warrant applications. Indeed, Agent Stossel specifically acknowledged that the application did not set forth every fact that investigators had learned through the investigation:

> Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of communications, I have not included every fact known to me concerning this investigation. I have set forth only those facts that I believe are essential to establish foundation necessary to support an order authorizing the interception of wire communications.

(Maes-I, Stossel Aff. at p. 7); (see also Maes-II, Stossel Aff. at p. 6; Robinson-I, Stossel Aff. at p. 10; Robinson-II, Stossel Aff. at pp. 5-6) (containing similar representations).[4]  Thus, the Court

---

[4]  As an initial matter, the Court rejects as legally incorrect the Defendants' apparent assertion that Title III imposes an obligation on the affiant to include every known fact at his disposal in order to satisfy the requirement that he make a "full and complete statement" to the authorizing judge under 18 U.S.C. § 2518(1)(c), and the two cases from outside this circuit upon which Robinson and Price rely for this proposition are plainly distinguishable. In United States v. Salemme, 978 F. Supp. 343 (D. Mass. 1997), the affiant omitted from his affidavit the fact that certain confidential informants had made themselves available to wear wires, which had an obvious bearing upon the investigators' declared need for a roaming bug to intercept conversations at a particular meeting, and to omit such information was to fail to make a full and complete showing of necessity. In United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987), the court also found that the affiant withheld information regarding an undercover informant who was working within the narcotics organization under investigation, and found further that the affidavit contained other statements that were misleading to the authorizing judge. In both Salemme and Simpson, therefore, the courts found that the issuing judges were actually misled

finds that for purposes of evaluating Defendants' argument for a <u>Franks</u> hearing, the issue is fundamentally whether the omitted information would have had a material affect on Judge Vanaskie's determination that the Government had established the factual predicate to demonstrate the necessity for Title III wiretap.  Upon careful consideration of all of the information that Robinson and Price have amassed and submitted in support of their request for a <u>Franks</u> hearing, together with a thorough assessment of the Government's response to this showing, the Court concludes that, although the omitted information in many cases was relevant to the Government's investigation, the information was not material to Judge Vanaskie's necessity finding.  Indeed, the Court finds that the vast majority of the omitted facts would have served to bolster the Government's necessity showing, given that virtually all of the information appears to have been limited in its probative scope relative to the investigation's objectives.  Still other omissions would have had, at most, a negligible impact, but would not have caused a reasonable jurist to find that the Government lacked the necessity for electronic surveillance.

Robinson asserted that although the Government had conducted more than 50 interviews with pimps and prostitutes, information from only a limited number of such interviews was included in Agent Stossel's affidavits.  Robinson asserts that "[j]ust the sheer number of such

---

by the omissions and misstatements, and any statement these courts made with respect to the showing required to be made for Title III purposes must be read within the factual context of these cases, which were considerably different from the case before this Court.  The Court agrees with the United States that Robinson's interpretation of the requirement of a "full and complete statement" is unduly broad and would lead to absurd results in cases like the one at bar, where an investigation had been ongoing for more than a year at the time investigators applied for a wiretap.  The Court does not read Title III or the cases interpreting its requirements to impose an obligation on investigators to describe, summarize, or mention every interview or other piece of evidence that they may have uncovered during the course of their investigation, much less that a failure to do so is, without more, fatal to their application.

omissions, along with the other omissions . . . argues for their materiality." (Doc. No. 617, at 8.) The Court disagrees with this conclusion, as it says nothing at all about the actual relevance of such omissions to a necessity inquiry. Moreover, review of the omitted information that the parties provided does not reveal that its omission would have caused a reasonable jurist to be misled regarding necessity, nor does it diminish the Government's stated need to resort to wiretaps. For example, a significant amount of the omitted information concerns statements or other information derived from interviews with prostitutes who provided limited information regarding the reach of the alleged conspiracy or its principals. Any reasonable review of these witness statements, both in isolation and as part of the larger whole of the investigation, makes clear that the value of the information these interviewees supplied was limited, and the inclusion of this information in Agent Stossel's affidavits would not have undermined the Government's showing of necessity.

Robinson posits that given what he interprets as a large number of potential witnesses, had the Government only pursued traditional investigative methods more aggressively, they "almost certainly" would have obtained "useful information[.]" (Id. at 9.) Robinson carries through this assessment by speculating that if Judge Vanaskie had been advised merely of the "large number" of "potential prostitute/pimp witnesses," and if he had been even more fully advised as to how much of the investigation had "progressed," "he would likely have concluded that" the Government lacked the necessity for a wiretap. (Id. at 9-10.) The Court finds Robinson's speculation in this regard to be unfounded, and it does not hold up in light of the information actually revealed in the interviews and witness statements, many of which appear to have provided little in addition to that which the investigators already knew. Still other

interviews appear to have revealed no obvious useful information relating to the investigation, particularly the interviews that various law enforcement officers held with several alleged pimps or other alleged co-conspirators.  Review of what was actually revealed during many of these interviews causes the Court to agree with the Government's assertion that Agent Stossel's omission of the facts of these interviews, or their details, was immaterial for purposes of evaluating necessity.

Even though a number of the omitted interviews did reveal information relevant to the investigation, the Government has persuasively demonstrated that the one feature that nearly all of the interviews with alleged prostitutes or other witnesses share is that they failed to provide substantial information regarding the conspiracy as a whole, and thus were not material to Judge Vanaskie's finding regarding necessity.

With respect to the Robinson applications, Price argues that Agent Stossel misstated and omitted information relating to what he describes as "the details and the success" of the Maes wiretaps, including what he asserts was the identification of "virtually every individual in the Indictment."  (Doc. No. 618, at 7.)  It appears that Price is contending that because the Government had learned a good deal of information through use of the Maes wiretaps, it had no need to apply for a wiretap on Robinson's phone.  In response, the Government notes that Agent Stossel in fact acknowledged that through the Maes wiretaps the Government had identified many members of the conspiracy and that the intercepted calls had provided evidence of criminal activity.  Moreover, the Government points to the fact that Agent Stossel specifically identified and summarized a number of conversations as part of the Robinson applications to demonstrate the types of information that the Maes wiretaps had yielded.  Most importantly, the Government

notes that Agent Stossel indicated that in connection with the investigation into Maes's alleged network, investigating agents had identified Robinson as the leader of another prostitution organization under investigation.  (Robinson-I, Stossel Aff. at 48.)  Agent Stossel then proceeded to summarize a number of calls between Robinson and Maes during which they allegedly discussed prostitution-related activity before proceeding to explain the necessity of a tap on Robinson's phone.  (Id. at 49-62.)  Reviewing the parties' submissions, the Court does not find that Agent Stossel failed to demonstrate necessity by declining to provide summaries of hundreds or thousands of telephone calls, nor does the Court find that Judge Vanaskie was misled by the extent of the disclosure made.  Furthermore, for purposes of obtaining a Franks hearing, the Court does not find that Price's recitation regarding the mere number of calls intercepted through the Maes wiretaps, without more, sustains Price's burden of demonstrating that a Franks hearing is warranted.

Robinson similarly argues that of the more than 530 calls intercepted from Maes-I, only 93 were "briefly and sketchily described" in the Maes-II affidavit.  It appears that Robinson believes Agent Stossel misled Judge Vanaskie by failing to advise him, to some degree, regarding each of the intercepted calls and that the omission of this information calls for a Franks hearing.  The Court disagrees for essentially the same reasons as discussed immediately above. Similarly, the Court finds that Robinson's identification of a select number of calls intercepted during Maes-I that were not included in Agent Stossel's affidavit in support of Maes-II does not compel a Franks hearing in this case because the omissions would not have had a material bearing on the issue of whether the wiretaps or extensions thereof were necessary for the investigation.  For the foregoing reasons, following a thorough review of Robinson's and Price's

assorted examples of omissions, the Court concludes that a <u>Franks</u> hearing is unwarranted.

In conclusion, the Court finds that the information supplied in Agent Stossel's affidavit, read in a practical and commonsense manner, and the detailed applications that preceded the authorization for each of the wiretaps at issue in this case were sufficient to demonstrate the Government's need to utilize electronic surveillance. Moreover, upon consideration of the numerous examples of factual information that Agent Stossel omitted from each of his affidavits, the Court does not find that such omissions were misleading, or that their inclusion in Agent Stossel's affidavits would have had a material bearing upon Judge Vanaskie's finding of necessity. For all of the foregoing reasons, Defendants' motions to suppress the results of the wiretaps on the grounds that the Government lacked necessity will be denied, as will Defendants' request that the Court convene a <u>Franks</u> hearing.

B. **Minimization**

Robinson next argues that all information derived from the wiretaps should be suppressed because the Government failed to minimize several of the intercepted calls in accordance with the requirements of 18 U.S.C. § 2518(5). Title III requires that all intercepts "be conducted in such a way as to minimize the interception of communications . . . ." 18 U.S.C. § 2518(5). Analyzing whether the Government complied with the statute requires courts to evaluate the reasonableness of the actual interceptions in light of the purpose of the wiretap and the totality of the circumstances. <u>United States v. Scott</u>, 436 U.S. 128, 131 (1978); <u>see also</u> <u>United States v. Hull</u>, 456 F.3d 133, 142 (3d Cir. 2006) (the relevant "inquiry is on the 'reasonableness' of minimization efforts, under the totality of the circumstances") (quoting <u>Scott</u>, 436 U.S. at 140). "The statute does not forbid the interception of all nonrelevant conversations." <u>Scott</u>, 436 U.S. at

140.   Indeed, "[w]hen investigating a wide-ranging conspiracy between parties known for their penchant for secrecy, broader interceptions may be warranted." Hull, 456 F.3d at 142; see also Scott, 436 U.S. at 140 (upholding uninterrupted interceptions in a drug conspiracy case).  The mere number of intercepted, but non-pertinent, calls is not dispositive of a minimization inquiry. United States v. Adams, 759 F.2d 1099, 1115 (3d Cir. 1985).

The Third Circuit has identified three "crucial" factors that must be considered when reviewing a defendant's allegation that the Government violated Title III's minimization requirement.  United States v. Armocida, 515 F.2d 29, 44 (3d Cir. 1975).  First, courts must consider the nature and the scope of the criminal enterprise that is the subject of investigation. Id.  In this regard, the Third Circuit recognized that "where the criminal enterprise under investigation is a large-scale conspiracy, it may be necessary for the government to intercept more conversations than where the investigation is of a more limited criminal undertaking." Id. Relevant to the wiretaps at issue in the instant case, the Third Circuit noted that more broad interception may be "especially [necessary] where . . . the judicially approved wiretap is designed to identify other participants in the conspiracy and to determine the scope of the conspiracy." Id. Second, courts should consider the "government's reasonable expectation as to the character of, and the parties to, the conversations." Id.   In that regard, where the Government knows the identities of the persons suspected of criminal activity whose conversations are to be targeted, or has knowledge regarding the time that criminal activity is expected to be discussed, investigators may tailor their intercepts accordingly.  Id. (citing United States v. James, 494 F.2d 1007, 1020 (D.C. Cir. 1974)).  Finally, courts should consider the degree of supervision exercised by the authorizing judge.  Id.  The Third Circuit noted that Title III contains a provision that allows the

19

authorizing judge to require that the Government make regular reports so that the judge can supervise the interception process.  Id. (citing 18 U.S.C. § 2518(6)).[5]

In this case, Robinson advances two arguments in support of his contention that the entirety of the electronic surveillance results should be suppressed for failure of the Government to minimize: (1) that the Government "essentially admits" that certain calls were intercepted within each 10-day reporting period "for which there was no reasonable basis for the calls not being minimized" and (2) that some of the calls were of extended duration and "nothing in their nature [was] even remotely criminal."  (Doc. No. 434, at 11-12.)  In response, the Government argues that Robinson ignores the fact that the minimization procedures outlined by the Government were approved by the issuing judge and that the Government advised Judge Vanaskie in the 10-day reports regarding those situations where minimization was impossible. Finally, the Government counters that the specific examples of phone calls that Robinson asserts were not criminal in nature do not support his minimization argument and, in fact, defeat his claim.

With respect to the specific and limited number of calls that Robinson contends were not minimized, the Government has provided a synopsis of these conversations, including what are

---

[5]  This section of Title III provides as follows:

> Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception.  Such reports shall be made at such intervals as the judge may require.

18 U.S.C. § 2518(6).

represented to be quotes taken directly from Maes, Robinson, and other participants.  Essentially, Robinson and the Government genuinely disagree whether a number of the calls to which Robinson objects were, in fact, criminal in nature.  Robinson construes several selected calls between Maes and Defendant Melissa Jacobs to be nothing more than a protracted domestic squabble, whereas the Government contends that these calls provide evidence of a pimp exercising control over a prostitute through the use of threats of violence, or consist of discussions relating directly to prostitution-related activity.  In other calls between Maes and other co-defendants, Robinson asserts that the majority of the conversations concerned mundane and entirely non-criminal topics, whereas the Government points to aspects of the conversation that appear to be criminal in nature, specifically regarding the control of prostitutes and finances relating to or derived from prostitution-related activities.

With respect to calls intercepted from Robinson's telephone, Robinson argues that several calls were between Robinson and third parties not relating explicitly or even implicitly to criminal activity, but rather concerned subjects such as the sale of automobiles and conversation with family or the mother of Robinson's child regarding private, non-criminal matters.  The Government counters that with respect to intercepted calls on which Robinson can be heard discussing the sale of assets or the use of funds to pay various personal or family bills, the calls reveal Robinson's use of the wires to send money through Western Union, and are therefore relevant to the charges that Robinson was laundering the proceeds derived from his alleged prostitution-related activities.  On other such calls, the Government notes that Robinson makes use of fictitious names for activating his cell phone, thus demonstrating Robinson's efforts at concealing his identity.  On still other calls, the Government contends that the subject of

conversation appeared to investigators to have potential relevance to Robinson's involvement in the transportation of third parties whose identity was not immediately apparent to law enforcement monitoring the calls. Robinson generally disputes the Government's characterization of these intercepted conversations.

The parties declined the opportunity for a hearing on the minimization dispute, and upon reviewing the arguments that Robinson advances and the Government's responses, in the context of the considerations enunciated by the Supreme Court in <u>Scott</u> and the Third Circuit in <u>Armocida</u>, the Court is satisfied that the Government did not run afoul of Title III's minimization requirements. It is clear that a primary aim of obtaining authorization for a Title III wiretap in this case was to aid the Government in learning the identities of the participants and their roles in the scope of a large interstate conspiracy to commit prostitution and launder money; in such circumstances it is not necessarily unreasonable for investigators to intercept a greater number of calls than in cases where the scope of the investigation is narrower. Furthermore, it cannot be ignored that Robinson has pointed to only a handful of intercepted calls that he contends were not properly minimized, out of two wiretaps and extensions thereof that yielded more than 5,000 calls. The Court has no information regarding the remaining calls, and appreciates that Robinson's counsel had reviewed only a select number prior to challenging the minimization efforts. Nevertheless, given the scope of the investigation and the limited number of intercepts identified in the motion, the Court cannot ignore the small percentage of calls that have been actually challenged in light of the large volume of intercepted communications.

With respect to the dispute between Robinson and the United States regarding whether the subjects of challenged intercepts were, or appeared reasonably to be, criminal in nature, the

Court finds that the United States has adequately provided an explanation as to why such calls were intercepted and not minimized.  Moreover, even if certain calls were arguably not obviously criminal for their entirety, in many instances the parties to such conversations were known by investigating officers to be involved in the very criminal activity under investigation, and thus the Court does not find it unreasonable in such cases for the agents to have remained on the line due to the real possibility that the conversation could have moved to criminal matters.  See United States v. Wilson, 835 F.2d 1440, 1445-46 (D.C. Cir. 1987) (holding minimization efforts were reasonable where investigators continued to monitor or intercept conversations that began with discussions of non-criminal matters because the parties could have turned their discussion to criminal matters, given the nature of the participants who were party to the call).[6]

Although Robinson dismisses the fact that the Government specifically advised Judge Vanaskie regarding its minimization efforts, including situations where minimization was either not possible or not attempted due to uncertainty regarding the subjects being discussed or the participants in the calls, the Court does not find this regular reporting to be irrelevant.  The Third Circuit has indicated that the degree of judicial oversight that the authorizing judge exercises should properly have a bearing on a reviewing court's inquiry into whether the steps taken to minimize interception were reasonable.  Armocida, 515 F.2d at 44-45.  In each order authorizing the requested interception, Judge Vanaskie not only included specified minimization standards, but also directed the Government to provide him with 10-day reports regarding the progress of the investigation.  In its reports, the Government complied with this directive, including to advise

---

[6] From a review of the parties' competing description of the topics discussed in these conversations, this appears to be precisely what occurred during a number of calls.

Judge Vanaskie regarding the steps taken to minimize the interception.  These considerations

provide further reason to reject Robinson's argument.

In conclusion, the Court does not find that the Government violated Title III's

minimization requirements, and Robinson's motion to suppress on this ground will be denied.[7]

### C.   Sealing

Title III provides that "[i]mmediately upon the expiration of the period of the order, or

extensions thereof, such recordings shall be made available to the judge issuing such order and

sealed under his directions."  18 U.S.C. § 2518(8)(a).  Title III contains an "explicit exclusionary

remedy for noncompliance with the sealing requirement."  United States v. Williams, 124 F.3d

411, 429 (3d Cir. 1997) (citation omitted); see also 18 U.S.C. § 2518(8)(a) (providing, in relevant

part, that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation

for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any

wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of

[18 U.S.C. § 2517]".).  The Third Circuit has instructed that the term "immediately" in the

provision requiring sealing should be construed to mean that the tapes should be sealed either as

---

[7] Although not necessary to resolution of this matter, the Court notes the parties also
dispute the appropriate sanction that would have been applicable had the Court found that the
Government failed unreasonably to minimize.  Robinson argues that if the Government fails to
minimize, the entirety of the electronic surveillance must be suppressed, although he provides
scant legal support for this argument.  In contrast, the United States contends that where certain
intercepted communications should have been, but were not, minimized, the appropriate remedy
is to suppress the particular offending intercepts.  In support of this argument, the Government
provides citation to decisional authority from outside of the Third Circuit.  See, e.g., United
States v. Baltas, 236 F.3d 27, 32 (1st Cir. 2001) (appropriate remedy for a failure to minimize a
particular call is not suppression of the wiretap but rather suppression of the offending call,
unless the moving party can demonstrate a "taint upon the investigation as a whole" arising as the
result of the failed minimization).  The Court need not resolve this dispute, as the Court
concludes that the Government complied with Title III's minimization requirements.

soon as practical after the surveillance ends or as soon as practical after the final extension order expires. Id. (citing United States v. Vastola, 915 F.2d 865, 875 (3d Cir. 1990)). If the tapes were sealed as soon as was practical under the circumstances, the court's inquiry ends and the motion to suppress will be denied. United States v. Carson, 969 F.2d 1480, 1491 (3d Cir. 1992). In cases where tapes of the intercepted communications are not sealed as soon as was practical, the Government must provide a satisfactory explanation for the sealing delay. Id. Such a proffered explanation must be the actual reason for the delay and not a post hoc justification. Id. at 1492.

In this case, Robinson notes that the Maes-II wiretap (the wiretap authorized as an extension of Maes-I) was terminated on Tuesday, June 14, 2005, and was sealed on Thursday, June 16, 2005. Robinson contends that the two-day gap between the termination of Maes-II and the formal sealing order compels the conclusion that the tapes were not sealed "immediately" within the meaning of 18 U.S.C. § 2518(8)(a). The Robinson-II wiretap (the extension of Robinson-I) was terminated on the evening of Friday, September 16, 2005, and was sealed on Thursday, September 22, 2005. Robinson argues that the Government's failure to obtain a formal sealing order for six days constitutes a violation of Title III's sealing requirement.

In response, the Government asserts that Maes-II concluded during the evening hours of Tuesday, June 14, 2005, and that Judge Vanaskie advised the Government that because he would be unavailable due to various conferences on June 15, 2005, that the agent should present the tapes for official sealing on Thursday, June 16, 2005.[8] The Government notes that it complied with Judge Vanaskie's instructions and the tapes were sealed on the date Judge Vanaskie

---

[8] The Government also states that the investigating agents personally sealed the tapes immediately upon the wiretap's termination. However, the tapes were not formally sealed for purposes of Title III until June 16, 2005.

25

directed.  With respect to the sealing of Robinson-II, the Government states that the wiretap terminated on Friday evening, September 16, 2005.  The Government avers that on the following Monday, September 19, 2005, Judge Vanaskie advised the agents that he would be attending conferences from September 19, 2005, until September 21, 2005, and that he would not be returning to his office until Thursday, September 22, 2005.  The Government states that Judge Vanaskie instructed the agent to present the tapes for sealing on September 22, 2005, and the Government complied with this instruction.

As a threshold finding, the Court has little trouble concluding that the Government presented the tapes for sealing "immediately" within the meaning of the statute as interpreted by the Third Circuit.  In <u>Carson</u>, the Third Circuit held, <u>inter alia</u>, that tapes from a particular wiretap were sealed immediately where the wiretap terminated on May 12, 1982, and the tapes were sealed on May 17, 1982.  <u>Carson</u>, 969 F.2d at 1498.  Important to the court's finding was the fact that two weekend days intervened between the conclusion of the wiretap and the date on which the tapes were presented for sealing.  <u>Id.</u>  Similarly, the court held that where a separate wiretap terminated on December 16, 2002, and was sealed six days later, on December 22, 2002, the tapes were sealed immediately for purposes of Title III.  <u>Id.</u>  As with the other wiretap, a weekend intervened between the termination of the surveillance and the sealing of the tapes.  <u>Id.</u>

In the case at bar, the Maes-II wiretap concluded on the evening of June 14, 2005, and the tapes were sealed on June 16, 2005, with only one business day intervening.  Considering this abbreviated schedule alone causes the Court to conclude that the Government had the tapes sealed immediately in compliance with Title III.  In addition, the United States has explained that Judge Vanaskie directed the agents to present the tapes for sealing on June 16 because he was

unavailable on June 15; such explanation, had it been necessary, would have caused the Court to find that the Government had provided an entirely reasonable explanation for the very brief delay that attended the sealing of the Maes-II.

Similarly, the Court finds that Robinson-II was sealed immediately for purposes of 18 U.S.C. § 2518(8)(a). The wiretap terminated during the evening of Friday, September 16, 2005. The tapes were thereafter sealed on the following Thursday, September 22, 2005 – a total of six days (one of which being the day on which the wiretap concluded during the evening hours), inclusive of two weekend days. Notably, this is precisely the amount of time between conclusion of a wiretap and the sealing of its tapes that the Third Circuit in <u>Carson</u> found to be "immediate" for purposes of the sealing requirements of Title III.

Even were the Court to have found that such delay compelled a finding that the tapes were not sealed immediately, the United States has proffered a legitimate explanation for the delay – namely, that the issuing judge specifically instructed the investigating agents to present the tapes for sealing on the Thursday following the wiretap's termination owing to his own travel schedule. Had it been necessary to consider this explanation, the Court would have found it to be a reasonable and sufficient justification for the delay, which was directed by the issuing judge who was at the time the Chief Judge of this Court.[9]

_____

[9] The Court emphasizes that it is not basing its finding that the Government complied with the sealing requirements upon the Government's own representation that Judge Vanaskie authorized unnamed agents to present the tapes on a date certain; as noted, the Court finds that the Government had the tapes sealed immediately for purposes of Title III. Again, the parties agreed to waive a scheduled evidentiary hearing on this pretrial motion, even after Robinson pressed the Court that an evidentiary hearing would be needed to verify the Government's representation regarding Judge Vanaskie's instructions. However, the Court notes that it has no reason to discredit the United States' representation regarding a statement that a judge of this Court, who personally reviewed, authorized, and supervised the electronic surveillance being

In conclusion, the Court finds that the Maes-II and Robinson-II wiretaps were sealed immediately in compliance with the sealing requirement set forth in 18 U.S.C. § 2518(8)(a). Accordingly, the motion to suppress the evidence derived from the wiretaps will be denied with respect to Robinson's argument that the sealing provision was violated.

### D.    Notice

Defendant Robinson next argues that the entirety of the wiretap evidence should be suppressed because the inventory and notification requirements set forth in 18 U.S.C. § 2518(8)(d)[10] were "deliberately and advertently not followed."  (Doc. No. 434, at 15.)  In

---

challenged, directed the sealing on a given date.  The Court's tendency to credit this representation is strengthened by the Court's own knowledge regarding the custom governing judicial involvement in Title III wiretap applications within this district until very recently.  For a substantial time, including during the time in which the Maes and Robinson wiretaps were active, all Title III wiretap applications and related judicial involvement were handled exclusively by the Chief Judge of the Middle District of Pennsylvania.  Thus, a representation that Judge Vanaskie directed the sealing process be undertaken at a specified time due to his unavailability, rather than to refer the matter to another judge of the district for sealing as Robinson contends should have been done, is consistent with the practice that previously governed judicial oversight of Title III wiretaps in this district.

[10]   Section 2518(8)(d) provides as follows:

> Within a reasonable time but not later than ninety days after . . . the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of –
>
> > (1) the fact of the entry of the order or the application;
> >
> > (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and
> >
> > (3) the fact that during the period wire, oral, or

support of this contention, Robinson points to the fact that upon motion of the United States,

Judge Vanaskie entered an order postponing the Government's obligations to comply with the

notification requirement until further order of the Court.  (Id. at 16.)  It appears that Robinson is

not contending that he was actually prejudiced by any delay that attended his receipt of notice

regarding the wiretaps, but that Judge Vanaskie's postponement order issued at the

Government's request should alone be found to be an impermissible violation of Title III's

provisions requiring suppression of the wiretap evidence.  The Robinson-II wiretap terminated on

September 16, 2005, and Robinson was indicted on November 9, 2005, and the indictment

clearly provided Robinson with notice that he had been recorded pursuant to a Title III intercept.

The remaining defendants were on notice regarding the wiretap evidence when they were charged

in the superseding indictment on December 8, 2005.

 As an initial matter, although the notice provisions of 18 U.S.C. § 2518(8)(d) are

"undoubtedly important" to the statutory framework of Title III, failure to meet the notice

requirement of section 2518(8)(d) does not alone render "unlawful an intercept order that in all

other respects satisfies the statutory requirements." United States v. Donovan, 429 U.S. 413, 434

---

electronic communications were or were not intercepted.

The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications, applications and orders as the judge determines to be in the interest of justice. On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.

18 U.S.C. § 2518(8)(d).

(1977).[11]  Nevertheless, Robinson argues that suppression is warranted for the alleged violation

of the notification provision on the basis of the Third Circuit's pre-Donovan decision in United

States v. Eastman, 465 F.2d 1057, 1062 (3d Cir. 1972), in which the court affirmed a district

court order suppressing wiretap evidence where the issuing judge had expressly waived the

Government's obligation to comply with the notification provision.  Eastman, 465 F.2d at 1062

(finding that such order "deliberately flouted and denigrated the provisions of Title III  . . . .").

Robinson's reliance upon Eastman is misplaced.  First, Judge Vanaskie's order

postponing the notification requirement pending further order of the Court operated to delay the

Government's obligation to provide notice; it did not entirely relieve the Government of this

requirement.  Additionally, the Court cannot perceive how Robinson or any of the remaining

Defendants would have actually been prejudiced by any delay in receiving notification, where it

is undisputed that the defendants received notice through the indictments, and where the

Government has made available to the defendants and their counsel the results of the intercepted

communications as part of the lengthy pretrial discovery that has transpired in this case.  See

Donovan, 429 U.S. at 439 n.26 (finding that respondents were not prejudiced by their failure to

receive post-intercept notice under either of the district court's inventory orders where the

Government made available to all defendants the intercept orders, applications, and related

---

[11]  Indeed, the Supreme Court also stated that "[not] every failure to comply fully with
any requirement provided in Title III would render the interception of wire or oral
communications 'unlawful.'"  Id. at 433 (quoting United States v. Chavez, 416 U.S. 562, 574-75
(1974)).  "To the contrary, suppression is required only for a 'failure to satisfy any of those
statutory requirements that directly and substantially implement the congressional intention to
limit the use of intercept procedures to those situations clearly calling for the employment of this
extraordinary investigative device.'"  Id. at 434 (quoting United States v. Giordano, 416 U.S.
505, 527 (1974)).

papers and where, in response to pretrial discovery motions, the Government produced transcripts of the intercepted conversations); see also United States v. Davis, 882 F.2d 1334, 1344 & n.13 (8th Cir. 1989) (holding suppression not required where the government mailed the required notice 34 days after the 90-day statutory period because defendant had access to the recorded calls and transcripts and failed to demonstrate actual prejudice).

In light of the foregoing, the Court does not find that the Government "deliberately and advertently" flouted the statutory notice requirements, and in any event the Court does not find that any delay in providing Robinson or the other defendants with notice regarding the Title III intercepts requires that the entirety of the wiretap evidence obtained in this case be suppressed, particularly given the lack of any apparent prejudice to the defendants given the substantial discovery that has been made available for some time.  Accordingly, Robinson's motion to suppress on the grounds that the Government violated Title III's notification requirements will be denied.

### E.     Probable Cause

Lastly, Robinson moves to suppress the results of the wiretaps because he claims that the Government failed to make an adequate showing of probable cause to believe that particular communications concerning the offenses being investigated would be obtained through such interception as required by 18 U.S.C. § 2518(3)(b).[12]  Robinson contends that in its applications and affidavits in support, the Government provided only a general statement regarding the

---

[12]   Section 2518(3)(b) provides that a judge may authorize a Title III wiretap if, inter alia, "there is probable cause for belief that particular communications concerning [a specified] offense will be obtained through such interception."  18 U.S.C. § 2518(3)(b).

communications that it would intercept,[13] and that it resorted to little more than boilerplate descriptions that were "anything but particular" but instead "could be used for essentially any conspiracy." (Doc. No. 34, at 16-17.) Other than to posit his interpretation that the applications were overly general in this particular regard, Robinson cites to no decisional authority in support of his argument.

The traditional and familiar Fourth Amendment principles regarding probable cause to conduct property searches are applicable to electronic surveillance authorizations. United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983). Under such principles, probable cause is determined by the totality of the circumstances and requires only that the Government demonstrate a probability of criminal activity. Illinois v. Gates, 462 U.S. 213, 235 (1983). A district court exercises only "deferential review" over an initial probable cause determination. Gates, 462 U.S. at 236. The Court will uphold an issuing judge's finding of probable cause if the affidavit upon which the search warrant is based provided a substantial basis for finding probable cause. United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993). "The resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Jones, 994 F.2d 1051, 1057-58 (quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)). "This [deferential standard] does not mean that reviewing courts should simply rubber stamp [the authorizing judge's] conclusions; it does require the application of a common sense standard." Tehfe, 722

---

[13] Specifically, in its Maes-I and Robinson-I applications, the Government stated that "it is anticipated that these communications will concern (a) conspiracy and attempts; (b) interstate travel in aid of racketeering; (c) money laundering; and (d) the manner, extent and identities of the co-conspirators, their relationships and the extend of their involvement in the conspiracy." (Maes-I Application, p. 4; Robinson-I Application, p. 6.)

F.2d at 1117 (citing <u>Ventresca</u>, 380 U.S. at 108, 109).

Robinson's assertion that the Government failed to demonstrate probable cause does not present the Court with a close issue. Reading the four applications and accompanying supporting affidavits of Agent Stossel, the Court concludes that Judge Vanaskie was provided with a substantial basis to conclude that evidence regarding the crimes and subjects expected to be intercepted through a wiretap would, in fact, be discovered. Robinson dismisses the Government's description of the communications it believed it would intercept as mere general boilerplate, but in fact the application specified the kinds of criminal conduct expected to be discussed over Maes's and Robinson's telephone, as well as discussions that would identify other co-conspirators, and these expectations were supported by specific representations regarding information already known by investigating agents. The Court does not interpret 18 U.S.C. § 2518(3)(b) to require the Government to provide even further particular detail regarding the communications expected to be intercepted, and the Court concludes that the wiretap applications and supporting materials provided ample probable cause under 18 U.S.C. § 2518(3)(b).

For the foregoing reasons, Robinson's motion to suppress the results of the wiretaps for lack of probable cause under 18 U.S.C. § 2518(3)(b) will be denied.

**III.    CONCLUSION**

For all of the reasons discussed above, Robinson's and Price's motions to suppress evidence derived from the wiretaps that were authorized in connection with this case will be denied. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No. 1:05-CR-443** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANKLIN ROBINSON, et al.,** | : | |
| | : | |
| **Defendants** | : | |

### ORDER

     **AND NOW**, this 8th day of June 2007, upon consideration of Defendants Robinson's and

Price's motions to suppress evidence derived from the wiretaps that were authorized in

connection with this case (Doc. Nos. 432, 454), and for the reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT** the motions are **DENIED**.

     **IT IS FURTHER ORDERED THAT** the motions of Defendants Britton, Maxwell, and

Hayes to adopt or join in the suppression motions (Doc. Nos. 467, 471 & 479) are **DENIED** as

moot.

                                        S/ Yvette Kane

                                        Yvette Kane, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania